UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| RIO BRAVO PIPELINE COMPANY, LLC, | § § § § | |
| PLAINTIFF, | § § | |
| v. | § § | CIVIL ACTION NO. 1:23-CV-168 |
| 5.11 ACRES OF LAND, MORE OR LESS, IN CAMERON COUNTY, TEXAS, CARLOS F. ALFONSO, and MARGOT VILA | § § § § § § | |
| DEFENDANTS. | § | |

**RIO BRAVO PIPELINE COMPANY, LLC'S ORIGINAL VERIFIED COMPLAINT FOR CONFIRMATION OF CONDEMNATION AUTHORITY, TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND PERMANENT INJUNCTION**

Plaintiff Rio Bravo Pipeline Company, LLC ("Rio Bravo") hereby files this Original Verified Complaint ("Complaint").

Pursuant to Federal Rules of Civil Procedure 65 and 71.1, Rio Bravo seeks confirmation of its condemnation authority as to a particular tract of land (5.11 acres, more or less, in Cameron County, Texas) and injunctive relief against the defendants herein to allow immediate access to certain property to complete certain non-invasive, land surveys for the construction of a federally-approved, natural-gas pipeline.

Rio Bravo possesses the right of eminent domain under the Natural Gas Act to enter on and condemn property rights for pre-construction activities, including conducting surveys and appraisals, construction, maintenance, and operation of the pipeline. Despite diligent efforts, Rio Bravo has been unable to contact the landowners. And, delaying access to the property at issue will result in irreparable harm to Rio Bravo, its customers, and the public in general.

Accordingly, Rio Bravo is seeking injunctive relief confirming its eminent domain authority and granting immediate access to the property to conduct the prerequisite surveys.

## PARTIES

1. Plaintiff Rio Bravo is a direct subsidiary of Spectra Energy Partners, LP ("Spectra"). In turn, Spectra is an indirect, wholly-owned subsidiary of Enbridge (U.S.) Inc. ("Enbridge") that operates Rio Bravo and the current pipeline construction project. Rio Bravo is a limited liability company organized and existing under the laws of the State of Delaware and has its principal place of business at 915 N. Eldridge Parkway, Houston, Texas 77079.

2. Defendant, a certain 5.11 Acres of Land, more or less, that is identified as Tract No. RBP-TX-CA-089, legally described as ABST 2- RIO GRANDE LOT 3 BLK C 5.1100 ACRES in Cameron County, Texas, and more specifically depicted on Exhibit 4 (the "Property").

3. Defendants Carlos Alfonso and Margot Vila (collectively, "Defendants" or "Landowners"), upon information and belief, are the owners of the Property and residents of the State of Louisiana.

## JURISDICTION & VENUE

4. This Court has jurisdiction over this matter pursuant to 28 U.S. Code §1331. Specifically, this matter seeks confirmation of Rio Bravo's eminent domain authority pursuant to the Natural Gas Act, 15 U.S.C. §717f(h) and Fed. R. Civ. P. 71.1, and immediate access to the Property for the limited purpose of completing necessary pre-construction surveys and appraisals pursuant to Fed. R. Civ. P. 65. Upon commencement of pipeline operations, Rio Bravo will become a natural gas company within the meaning of the Natural Gas Act, 15 U.S.C. §717, *et seq.* (the "NGA"), engaged in the transmission of natural gas in interstate commerce and subject to the

jurisdiction of the Federal Energy Regulatory Commission ("FERC" or "Commission"). *See* 15 U.S.C. §717a(6).

5. Venue is proper in this judicial district pursuant to 28 U.S. Code § 1391(b)(2) because the Property that is the subject of the action is situated in this judicial district. Rio Bravo is constructing a FERC approved pipeline project in Cameron County, Texas that will cross the Property owned by Defendants.

## FACTUAL ALLEGATIONS

### A. RIO BRAVO'S CONSTRUCTION PROJECT PURSUANT TO ITS FERC CERTIFICATE

6. Upon commencement of pipeline operations, Rio Bravo will become a natural gas company, as that term is defined by the NGA, engaged in the transmission of natural gas in interstate commerce and subject to the jurisdiction of FERC. *See* 15 U.S.C. §717(a)(6); Exhibit A, Declaration of Walton Johnson ("Johnson Decl.") at ¶5.

7. Rio Bravo applied for and was granted a certificate of public convenience and necessity ("Certificate"), issued by FERC on November 22, 2019 in Docket No. CP16-455-000 ("November 22 Order"),[1] authorizing Rio Bravo to construct and operate a new pipeline system in South Texas.[2] *See* Johnson Decl. at ¶4.

8. Rehearing was sought and denied, after which the November 22 Order was appealed to the D.C. Circuit. On August 3, 2021, the D.C. Circuit remanded the Authorization and

---

[1] *Rio Bravo Pipeline Company, LLC*, 169 FERC ¶ 61,131 (2019) (Exhibit 1).
[2] The Rio Bravo system will parallel, in significant part, the Valley Crossing Pipeline constructed and operated by Valley Crossing Pipeline, LLC, a wholly owned subsidiary of Enbridge. Valley Crossing is an intrastate pipeline with its facilities located wholly within the State of Texas and is exempt from the jurisdiction of FERC. Valley Crossing is a gas utility under Texas law and subject to the jurisdiction of the Railroad Commission of Texas ("RRC"). Valley Crossing is also an intrastate pipeline within the meaning of Section 2(16) of the Natural Gas Policy Act of 1978 ("NGPA") and provides interstate services pursuant to Section 311(a)(2) of the NGPA, as implemented by Subpart C of Part 284 of the regulations of the FERC. Valley Crossing went into service in 2018.

Rehearing Orders, holding that FERC's NEPA analyses of the projects' impacts on climate change and environmental justice communities were deficient, and thus, FERC "must also revisit its determinations of public interest and convenience under Sections 3 and 7 of the NGA."[3] *See* Johnson Decl. at ¶4.

9. On June 16, 2020, Rio Bravo moved for an amendment to the November 22 Order in Docket No. CP20-481-000, seeking to modify, in part, the specifications for the pipeline system. *Id*. at ¶5.

10. On April 21, 2023, FERC issued an Order Amending Section 7 Certificate ("April 21 Order"),[4] granting Rio Bravo's request to reduce the number of authorized compressor stations from three to one, increase the horsepower at the remaining compressor station, eliminate certain measurement facilities, change the operating pressure of the pipelines and header system, and increase the diameter of one of two parallel pipelines (the "Project"). Pursuant to Section 157.20(a) of the Commission's regulations[5] and Ordering Paragraph (I) of the April 21 Order, Rio Bravo accepted the certificate, as amended, issued in the April 21 Order for the Project on May 9, 2023. *See* Johnson Decl. at ¶5.

11. The Project crosses a certain tract of land in Cameron County, Texas, identified as Tract No. RBP-TX-CA-089, and owned by Defendants Carlos Alfonso and Margot Vila, a plat for which is attached hereto and marked Exhibit 4. A Limited Title Certificate verifying Defendants' ownership of the Property is attached hereto and marked Exhibit 5. *See* Johnson Decl. at ¶7.

---

[3] *Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321 (D.C. Cir. 2021).

[4] *Rio Bravo Pipeline Company, LLC*, 183 FERC ¶ 61,046 (2023) (Exhibit 2).

[5] 18 C.F.R. § 157.20(a) (2022).

12. Rio Bravo currently plans to construct and operate a new interstate natural gas pipeline system designed to provide up to 4.5 billion cubic feet per day (Bcf/d) of firm natural gas transportation capacity from several interconnects in the vicinity of the Agua Dulce Hub in Nueces County, Texas, to Rio Grande's liquefied LNG export terminal on the Brownsville Ship Channel in Cameron County, Texas. As approved, the Rio Bravo Pipeline comprises: a 2.4-mile-long header system, 135.7 miles of parallel 48 inch and 42 inch parallel pipelines; one compressor station; along with associated facilities, including temporary construction workspace, temporary access roads, and permanent access roads in the South Texas counties of Jim Wells, Kleberg, Kenedy, Willacy, and Cameron. *Id*. at ¶6.

13. Pursuant to its Certificate, as amended, Rio Bravo is authorized to begin construction of the Project on or before September 2025 and Rio Bravo's project is required to be made available for service by November 22, 2026.[6] The construction and operation of the Project are for the public convenience and necessity because they are among the activities authorized by the Amended Certificate. Accordingly, Rio Bravo possesses the right of eminent domain under the NGA to enter on and condemn property rights for the construction, maintenance, and operation of this Project. *See* Johnson Decl. at ¶8.

14. Rio Bravo's construction timeline for the Project is based on a critical available for service date of November 22, 2026, to meet customer commitments. To meet this available for service date, construction must begin in September 2025. *Id.* at ¶10.

15. Before construction can commence, FERC requires that various surveys be performed, including civil, environmental, cultural, and archeological surveys for a 300-foot corridor around the proposed pipeline route. 18 C.F.R. §157.206. This wider survey corridor assists

---

[6] *Rio Bravo Pipeline Company, LLC*, 183 FERC ¶ 61,046 at fn. 17 (2023).

FERC staff and Rio Bravo in assessing possible impacts on environmental features adjacent to project construction activities. The cultural surveys are used to determine the presence or absence of historic and prehistoric objects, structures, or sites. Rio Bravo is required to have all environmental surveys submitted to the State Historic Preservation Office ("SHPO") at least 45 days prior to the start of construction. Construction cannot begin until SHPO approves the surveys. The National Historic Preservation Act ("NHPA") requires SHPO to advise and assist federal agencies in carrying out their historic preservation responsibilities. This advice includes considering the appropriateness and adequacy of the efforts undertaken to identify and mitigate archaeological sites. *Id.* at ¶11.

16. Coordinating the commencement of construction with this regulatory deadline requires that Rio Bravo commence environmental surveys at least <u>four months</u> prior to the start of any construction in order to adequately address any potential issues and obtain required agency approvals. For example, the first step for an archaeological survey is a Phase I pedestrian survey. The archaeologists walk the length of the survey corridor and dig test holes at set intervals. In some cases when artifacts are found, there is not enough information to determine if the site is eligible or not for listing on the National Register of Historic Places ("NRHP"). In that case, the archaeologists must consult with SHPO to determine what is required to make the necessary determination, which is called Phase II testing. Phase II testing can involve (a) using a backhoe to dig down several feet for deep testing or (b) scraping about a foot deep for testing, depending on the type of historical resource that is potentially present. The information from both Phase I and II testing must be provided in a report to SHPO for them to review and make a determination. If Phase II testing finds that a property is eligible for listing on the NRHP, Rio Bravo would have to design a way to avoid any impact to the archeological/cultural site. The multiple steps of testing,

requiring consultation with SHPO at each step, and then possibly having to design a way to avoid a NRHP site, requires that Rio Bravo initiate its survey work at least four months ahead of starting construction. *Id*. at ¶12.

**B. RIO BRAVO'S EFFORTS TO CONTACT DEFENDANTS**

17. A Rio Bravo land agent first attempted to contact the Defendants concerning survey permission in August 2023 and has since attempted to locate and contact them on multiple occasions concerning permission to conduct necessary preliminary civil, environmental, and archaeological surveys as well as any necessary core sampling activities required by FERC in connection with the Project on the Property. *Id*. at ¶14.

18. Specifically, after a diligent search, Rio Bravo discovered that the owners may be residing in Mexico. As a result, in September 2023, the land agent reached out to a contact in Mexico to retrieve a viable phone number for Defendants. On October 26, 2023, the land agent also mailed a letter to Defendants in Mexico (and in Spanish) attempting to retrieve their permission to access the Property. Rio Bravo also searched the Tax Records, the Public Records, internet searches through various databases, including BeenVerified.com. Despite these diligent efforts, Rio Bravo has been unable to contact Defendants to obtain survey permission. *See* Johnson Decl. at ¶15; Exhibits 6 and 7; Exhibit B, Declaration of Michael Donald ("Donald Decl.") at ¶¶2-4.

19. Due to the Rio Bravo's inability to obtain survey authority from Defendants, Rio Bravo has limited information regarding the current condition of the survey corridor, the proposed pipeline easement, and the exact final route of the pipeline on the Property. Other than preliminary observations from public roads and neighboring public access points of the Property, Rio Bravo is at a standstill until it can gain access to the survey corridor to complete the remaining surveys. At

a minimum, Rio Bravo knows it must mobilize work crews to complete the surveys discussed above, including appraisal access, which work can be completed, assuming a Phase II archeological survey is not necessary, in approximately 1 day utilizing hand shovels and survey equipment. *See* Johnson Decl. at ¶¶17-18.

### C. RIO BRAVO'S CONSTRUCTION TIMELINE AND NEED FOR IMMEDIATE ACCESS

20. The inability of Rio Bravo to obtain survey permission due to the unavailability of Defendants poses a significant threat to Rio Bravo's ability to meet the available for service date for the Project. As of the date of this filing, the Defendants have not approved survey or appraisal access to the Property, which denial puts in jeopardy Rio Bravo's ability to meet the market demands of its customers, fulfill the representations it has made to the marketplace, and meet contractual commitments ranging from gas supply to construction. *Id*. at ¶19.

21. Customer demand for natural gas is the foundation for the commercial arrangements between Rio Bravo and its customer. These commercial arrangements provide the timing and establish the need for necessary transportation services to transport natural gas across the Project planned for construction. If these deadlines are not met, the impact will be irreparable, non-recoverable, and any operational impact of not meeting the available for service date is substantial. *Id*. at ¶¶20-21.

22. The infrastructure facilitates, commercial arrangements between the parties, and other construction agreements and coordination will be negatively impacted if natural gas does not flow across the Project by November 2026. The market, customer, and other contracting parties' reaction to not meeting an available for service requirement cannot be quantified in money or, in the alternative, would be non-recoverable from the Defendants. *Id*. at ¶22.

23. Thus, to meet the needs of its customer and satisfy the energy needs of the public, the Project must be completed, tested, and available for service by November 22, 2026. The Project will enable the delivery and receipt of needed gas supply and will provide a more reliable source of supply. *Id*. at ¶23.

24. Additionally, Rio Bravo's customer, as well as the public in general, must have confidence and assurance that the Project can be completed in time to meet the gas requirements in the region and be available for service by November 22, 2026. Indeed, Rio Bravo's customers requested that the Project be completed by this date so as to ensure supplies are available through the pipeline by this timeframe. Both gas customers and producers linked by the Project are arranging gas sales agreements that contemplate that gas will be flowing through the pipeline by the anticipated completion date. Without the ability for Rio Bravo to begin construction on the Project in sufficient time to have it available for service as expected, the customers and others relying on the pipeline will be required to seek other supplies and transportation alternatives, if any are available to meet the public need, or shut-in production until the pipeline is completed. Such short-term gas supplies and transportation are likely to be more expensive, and likely will result in increased cost to the public. If none are available, wells could be shut-in, and this vital natural gas will not be available to targeted market areas. *Id*. at ¶24.

25. In order to fulfill these needs, Rio Bravo must have the pipeline available for service by November 22, 2026. Thus, to comply with the objectives of the Amended Certificate, it is crucial that Rio Bravo commence construction activities no later than September 2025, which means that surveys and appraisals must be commenced and completed immediately. *Id*. at ¶25.

26. Construction of a highly regulated natural gas pipeline is a process that goes significantly beyond simply digging a trench and laying the pipe. Conventional overland

installation of a pipeline is best represented as a moving assembly line with a construction spread (crew and equipment) proceeding along the construction right-of-way in a continuous operation. The entire process is coordinated to limit the time of disturbance to an individual area, thereby minimizing the potential for erosion and the loss of normal use. *Id*. at ¶26.

27. To expedite construction and to meet its in-service obligations, Rio Bravo is in the process of issuing construction contracts to pipeline contractors for the Project. The prime contractor will provide separate crews for each stage of construction, which will include multiple crews for clearing, grading, stringing, bending, welding, coating, ditching, lowering in, road boring and creek crossing, horizontal directional drilling, tying in loose segments (also referred to as "tie-ins"), backfilling, hydrostatic testing, clean up, maintenance, environmental oversight, and supervision. *Id*. at ¶27.

28. It is critical that Rio Bravo be able to provide the prime contractors with access to all properties along the route of the Project as soon as possible, which will facilitate construction starting by September 2025. If the prime contractors are not able to enter in sequence any property along the route of the Project, then the crews must move around or skip that property and return to it at a later date. Depending upon the specific circumstances, skipping a property may result in a net loss of up to three days of construction time, with each "skip" impeding Rio Bravo's ability to complete the Project as required. *Id*. at ¶28.

29. In addition, the construction companies, with which Rio Bravo has contracted, have set aside months, beginning in September 2025 through November 2026, to construct the pipeline. Because of the large number of energy-related construction projects currently underway or planned, qualified pipeline contractors are in high demand, and unreasonable delays in constructing the Project during the time frame during which Rio Bravo's contractors have

committed will create the risk that other obligations may pull them away from the Project prior to completion. If entry upon this un-surveyed tract is delayed, then the construction crews will be delayed. The lost revenue to the shippers by their inability to transport their volumes of natural gas to market as well as the lost opportunity to provide natural gas to the end-users to minimize natural gas prices in the overall marketplace are unknown. However, the losses and economic impact of not meeting the available for service date would be significant, unrecoverable, and irreparable. *Id*. at ¶28.

30. The Property at issue, which is owned by Defendants, is necessary for the completion of the Rio Bravo Project as approved by FERC. Rio Bravo has been unable to secure survey or appraisal access across the Property by agreement. *Id*. at ¶29.

31. Rio Bravo's survey and appraisal work will impact an area of approximately 0.94 acres, as shown of the attached plat marked as Exhibit 4. The work will be noninvasive unless Phase II archeological survey work is required. Rio Bravo will restore the grade over the survey corridor and will indemnify Defendants from any cost or damage associated with the survey and appraisal work. A bond of $5,000.00 adequately covers any impact Rio Bravo might have to the Property for the activities addressed in this request for injunctive relief. *Id*. at ¶30.

## CAUSES OF ACTION

### A. DECLARATORY JUDGMENT

32. Rio Bravo incorporates by reference all factual allegations above as if fully set forth herein.

33. A real, substantial, and immediate controversy exists between Rio Bravo and the Defendants concerning Rio Bravo's condemnation authority and its need for immediate access to the Property to conduct necessary surveys and appraisals under the Natural Gas Act.

34. To establish its eminent domain authority, a natural gas company must show that: (1) it holds a valid certificate of public convenience and necessity, (2) the property to be condemned is necessary for the project authorized by the certificate, and (3) the natural gas-company cannot acquire the necessary easements by contract. *See Transcon. Gas Pipe Line Co. v. 6.04 Acres*, 910 F.3d 1130, 1154 (11th Cir. 2018).

35. First, Rio Bravo holds a FERC Certificate that authorizes the construction and operation of the Project. *See* Johnson Decl. at ¶¶4-5. This Certificate cannot be challenged in this proceeding because a district court's role in an eminent domain proceeding is limited by statute. Specifically, the district court's role is simply to evaluate the scope of the certificate and to order condemnation of property as authorized by FERC in the certificate. *See, e.g., Mt. Valley Pipeline v. Simmons*, 307 F. Supp. 3d 506, 518 (N.D. W.Va. 2018) (*citing Columbia Gas Transmission, LLC v. 370 Acres, More or Less*, No. 1:14-0469-RDB, 2014 U.S. Dist. LEXIS 144055, at *3 (D. Md. 2014)).

36. Second, the property interests subject to eminent domain are depicted on the project alignment attached hereto as Exhibit 3, and portions of the Property fall within the area that may potentially be affected by Rio Bravo's construction of the Project. Here, the survey corridor workspace sought for access is clearly within the boundaries of the temporary survey workspace authorized by FERC and deemed necessary for the Project. *See Rover Pipeline LLC v. Rover Tract*, No. 1:17CV18, 2017 U.S. Dist. LEXIS 216978, at *5 (N.D.W. Va. 2017) (finding that the plaintiff satisfied the second element when plaintiff showed that the easements were necessary and consistent with the easement rights FERC authorized plaintiff to obtain as described in the Certificate).

37. Third, Rio Bravo can establish an inability to agree because it has been unable to contact Defendants despite diligent efforts. *See* Johnson Decl. at ¶¶13-15.

38. As a result, Rio Bravo possesses the right of eminent domain under the NGA to enter on and condemn property rights for pre-construction activities. Therefore, Rio Bravo requests that the Court declare that Rio Bravo has eminent domain authority pursuant to the NGA and is entitled to immediate access to the Property for the limited purpose of completing the necessary pre-construction surveys and appraisals within the areas depicted on Exhibit 4.

B. **REQUEST FOR A TEMPORARY RESTRAINING ORDER**

39. Rio Bravo re-alleges each of the foregoing paragraphs as it set forth fully herein.

40. Rio Bravo seeks a temporary restraining order, permitting immediate access to the Property to complete the required surveys and appraisals of the Property.

41. Federal courts across the country have recognized that a district court has the equitable authority to grant immediate entry and possession to a natural gas company in a condemnation action brought under the Natural Gas Act. *See, e.g., Transcon. Gas Pipe Line Co. v. 6.04 Acres*, 910 F.3d at 1152 ("[D]istrict courts retain their equitable authority to issue preliminary injunctions in condemnation proceedings brought under the Natural Gas Act[.]"); *E. Tenn. Natural Gas Co. v. Sage,* 361 F.3d 808, 826-828 (4th Cir. 2004) (citing in approval numerous cases granting immediate possession of easements); *Venture Glob. Gator Express, LLC v. Land*, No. 20-2802, 2021 U.S. Dist. LEXIS 179497, at *14 (E.D. La. 2021) (finding Sage persuasive in the context of immediate possession); *Transcameron Pipeline LLC v. Pipeline Servitude*, No. 19-cv-0567, 2019 U.S. Dist. LEXIS 146887, at *9 (W.D. La. 2019) (granting TransCameron immediate access to the property).

42. This authority includes, but is not limited to, issuing injunctive orders to conduct pre-construction activities, such as exercising survey and appraisal rights. *See Fla. Gas Transmission Co. LLC, v. 2.876 Acres of Land*, No. 4:18-CV-1162, 2018 U.S. Dist. LEXIS 236715, at *15 (S.D. Tex. 2018) ("[Plaintiff] is awarded injunctive relief permitting it . . . the immediate right of entry and access to the Defendant Properties to survey[.]"); *Se. Supply Header, LLC v. 180 Acres in George Cty.,* Civil Action No. 2:07CV280KS-MTP, 2008 U.S. Dist. LEXIS 9989, at *11 (S.D. Miss. 2008) ("SESH may immediately begin pre-construction and construction related activities for the purpose of constructing the Pipeline at the location approved and certificated by FERC . . . include[ing], but not limited to, surveys, examinations, and tests[.]"). Accordingly, as long as Rio Bravo can satisfy the requirements for a temporary restraining order, this Court has the authority to grant the requested relief.

43. The party seeking a temporary restraining order must show: (1) a substantial likelihood that plaintiff will prevail on the merits, (2) a substantial threat that irreparable injury will result if the injunction is not granted, (3) that the threatened injury outweighs the threatened harm to defendant, and (4) that granting the restraining order will not disserve the public interest. *Harmon v. Fat Cat Boatworks, LLC,* No. 2:22-CV-00074, 2022 U.S. Dist. LEXIS 245879, at *3-4 (S.D. Tex. 2022).

44. First, Rio Bravo will likely prevail on the merits on its declaratory judgment under the Natural Gas Act as explained in Paragraphs 32-38 above. *See Gulf S. Pipeline Co. LP v. Douglas,* No. 4:19-CV-02890, 2020 U.S. Dist. LEXIS 93386, at *6 (S.D. Tex. 2020) (finding that the plaintiff demonstrated a substantial likelihood of success on the merits when the plaintiff showed that (1) plaintiff held a FERC certificate authorizing the project, (2) plaintiff showed that

the easements were necessary for the project, and (3) plaintiff was unable to obtain the easements by contract).

45. Second, Rio Bravo will suffer irreparable injury if the restraining order is not granted. Rio Bravo's construction timeline for the project is dictated by: (i) the critical in-service date of November 22, 2026, (ii) coordinated construction schedules to meet the in-service date, and (iii) the commercial necessity and market demand established by the Projects requirements for delivery of natural gas from Rio Bravo. *See* Johnson Decl. at ¶¶19-30.

46. Without the ability for Rio Bravo to begin construction on the Project in sufficient time to have it in-service as expected, the customers and others relying on the pipeline will be required to seek other supplies and transportation alternatives, if any are available to meet the public need, or shut-in production until the pipeline is completed. Such short-term gas supplies and transportation are likely to be more expensive, and likely will result in increased cost to the public. If none are available, wells could be shut-in, and this vital natural gas will not be available to market areas in the United States. *See* Johnson Decl. at ¶24. The losses and economic impact of not meeting the in-service date would be significant, unrecoverable and irreparable. *Id*. at 21; *see also Sage*, 361 F.3d at 828-29 (holding that irreparable harm would occur where the project might be delayed for months, the delay jeopardized Plaintiff's ability to meet contractual deadlines to provide natural gas to several generation plants and local gas utilities by a certain date, and the delay would cause market disruption).

47. Third, failure to grant the relief will result in harm to Rio Bravo, which will outweigh harm to Defendants, if any. Rio Bravo's survey and appraisal work will impact an area of approximately 0.94 acres, as shown of the attached plat marked as Exhibit 4. The work will be noninvasive, unless Phase II archeological survey work is required. Rio Bravo will restore the

grade over the survey corridor and will indemnify the Defendants from any cost or damage associated with the survey and appraisal work. A bond of $5,000.00 adequately covers any impact Rio Bravo might have to the Property for the activities addressed in this Temporary Restraining Order and Injunction Request. *See* Johnson Decl. at ¶¶30. Accordingly, the third element for a temporary restraining order is satisfied.

48. Finally, the public interest is served by the issuance of this temporary restraining order. In granting the Certificate and through Rio Bravo's compliance with the FERC regulations, FERC determined that Rio Bravo's Project serves the public convenience and necessity and is therefore necessary. *Gulf S. Pipeline Co. LP,* 2020 U.S. Dist. LEXIS 93386, at *10 (holding that "[t]he public interest is properly served by improvement to pipeline infrastructure and addition of outlets for the transmission of requisite natural resources" and granting injunctive relief for immediate access to property at issue).

C. **REQUEST FOR A PRELIMINARY AND PERMANENT INJUNCTION**

49. Rio Bravo re-alleges each of the foregoing paragraphs as it set forth fully herein.

50. Rio Bravo seeks a preliminary injunction and permanent injunction, confirming and permitting it immediate access to the Property to complete the required surveys and appraisals of the Property.

51. The four elements a plaintiff must establish to secure a preliminary injunction are: (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest. *E.g., Janvey v. Alguire,* 647 F.3d 585, 595 (5th Cir. 2011). The Supreme Court of the United States has recognized that the standards applicable to requests for

preliminary and permanent injunctions are "essentially the same" except that the plaintiff must show actual success on the merits when pursuing a permanent injunction. *See Heil Trailer Int'l Co. v. Kula*, 542 F. App'x 329, 335 (5th Cir. 2013).

52. Accordingly, Rio Bravo can satisfy the elements of a preliminary and permanent injunction for the reasons set forth in the above paragraphs.

## PRAYER FOR RELIEF

Rio Bravo respectfully prays for the following relief:

1. A declaratory judgment declaring that Rio Bravo possesses condemnation authority as it relates to the Property as depicted on Exhibit 4;

2. A temporary restraining order, preliminary injunction, and permanent injunction restraining Defendants, or any entities or individual acting on their belief or in concert therewith, from denying access to or interfering with Rio Bravo's access and operations on the Property to conduct surveys and appraisals; and

3. All losses, damages, and all other equitable relief to which Rio Bravo may be entitled.

**DATED**: November 20, 2023

RESPECTFULLY SUBMITTED,

**JONES WALKER LLP**

*/s/ Michael B. Donald*
MICHAEL B. DONALD (Texas Bar No. 00792287)
811 Main Street, Suite 2900
Houston, Texas 77002
Telephone No.: (713) 437-1800
Facsimile No.: (713) 437-1810
Email:  mdonald@joneswalker.com

**Attorney for Rio Bravo Pipeline Company, LLC**